**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **ROCHELLE PERKINS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:10CV 581 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Rochelle Perkins for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 17). Defendant has filed a Brief in Support of the Answer. (Doc. No. 21).

## Procedural History

On May 24, 2007, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on December 1, 2004. (Tr. 100-02, 108-10). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated September 1, 2009. (Tr. 47-50, 5-14). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied on February 4, 2010.  (Tr. 4, 1-3).

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§

404.981, 416.1481.

## **Evidence Before the ALJ**

### A.     **ALJ Hearing**

Plaintiff's administrative hearing was held on June 16, 2009.  (Tr. 17).  Plaintiff was

present and was represented by counsel.  (Id.).

The ALJ examined plaintiff, who testified that she had a twelfth grade education and

attended junior college.  (Tr. 18).  Plaintiff stated that she did not receive any vocational or

technical training.  (Id.).  Plaintiff testified that she took an online computer class.  (Tr. 19).

Plaintiff stated that her last job was a file clerk position.  (Id.).  Plaintiff testified that she

received unemployment benefits in 2003.  (Id.).  Plaintiff stated that she has never received

workers' compensation.  (Id.).

Plaintiff testified that she has been incarcerated in jail on two occasions but has never been

in prison.  (Tr. 20).  Plaintiff stated that she last served time in jail in May of 2002 for passing bad

checks.  (Id.).  Plaintiff testified that she has never been convicted of a DUI or DWI.  (Id.).

Plaintiff stated that she was in rehab in October of 2006 or 2007.  (Id.).  The ALJ instructed

plaintiff's attorney to obtain these records and granted him a month to do so.  (Id.).

Plaintiff testified that she has never been hospitalized for alcohol or drugs.  (Tr. 21).

Plaintiff stated that she "cleaned up" on her own by attending church after rehab.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she last worked as a file

clerk.  (Id.).  Plaintiff stated that she has also performed customer service work and administrative

assistant work in the fifteen years prior to the hearing.  (Id.).

Plaintiff testified that she last performed work as a file clerk between January and March of 2009.  (Id.).  Plaintiff stated that she only worked five to seven hours a week at this position. (Tr. 22).  Plaintiff testified that she obtained this position through a work-study program at her school.  (Id.).  Plaintiff explained that she was pursuing a bachelor's degree in business at the time of the hearing.  (Id.).  Plaintiff testified that she experienced significant complications when she was trying to perform this job.  (Id.).  Plaintiff stated that she became light-headed and dizzy because the job required a lot of reaching above her head and bending low.  (Id.).  Plaintiff testified that she occasionally had problems with her arm due to reaching and pulling files.  (Id.). Plaintiff stated that she also became lightheaded when she was on her feet for too long.  (Id.). Finally, plaintiff testified that she experienced difficulty gripping and grasping files.  (Tr. 23).

Plaintiff stated that she is unable to sustain full-time work due to her problems with grabbing, grasping, and carrying things.  (Id.).  Plaintiff testified that she frequently drops objects when she is in the middle of performing tasks.  (Id.).  Plaintiff stated that she also has calluses on her feet, which makes her unstable when walking or standing for too long.  (Id.).

The ALJ asked plaintiff how she plans to use her business degree.  (Id.).  Plaintiff testified that she had not decided how she would use her business degree.  (Id.).  Plaintiff stated that she knew she would not pursue a focus in accounting because she had difficulty with math.  (Id.).

Plaintiff testified that the files she carried at her last position were not heavy.  (Id.). Plaintiff stated that she had difficulty reaching, bending, and being on her feet for long periods. (Id.).  Plaintiff testified that she has to take breaks occasionally to keep from becoming light-headed.  (Tr. 24).  Plaintiff stated that she becomes light-headed after she is on her feet for longer

than fifteen to twenty minutes. (Id.). Plaintiff testified that she becomes unstable due to the calluses on her feet. (Id.). Plaintiff stated that her light-headedness may also be caused by the medication she takes and her arthritis. (Id.).

Plaintiff testified that she started taking college classes after her last job ended. (Id.). Plaintiff stated that she was unable to work because she had many doctor appointments, she had physical problems and mental health issues. (Id.). Plaintiff testified that she became depressed about six months after she stopped working. (Id.). Plaintiff stated that she decided to take classes to better her life. (Tr. 25). Plaintiff testified that her probation officer pressured her to get a job or attend school and threatened to revoke her probation because she was not doing anything. (Id.).

Plaintiff stated that her last position was a customer service position at Check and Go, a payday loan business, in 2004. (Id.). Plaintiff testified that it was stressful for her to handle large amounts of money and to not know who was in the building with her. (Id.). Plaintiff stated that she was under a lot of pressure at this position. (Id.). Plaintiff testified that, although her title was "customer service," she was responsible for large sums of money. (Tr. 26). Plaintiff stated that her drawer was short funds on one or two occasions and she was nervous that she would be accused of theft. (Id.). Plaintiff testified that she was locked in the building and was unable to leave the premises to go to lunch. (Id.). Plaintiff stated that she was under significant pressure at this position. (Id.).

Plaintiff's attorney then resumed examining plaintiff, who testified that when she was depressed, she felt like she was digging herself deeper into a dark hole. (Id.). Plaintiff stated that she experienced symptoms of lack of concentration and lack of desire to do anything socially.

(Tr. 26-27).  Plaintiff testified that she started seeing a doctor at this point, who prescribed medication for her depression.  (Tr. 27).

Plaintiff stated that she experienced depression at the time of the hearing.  (Id.).  Plaintiff testified that she has difficulty concentrating and staying focused.  (Id.).  Plaintiff stated that she has periods during which she sleeps for days and she has periods during which she is unable to sleep at all.  (Id.).  Plaintiff testified that she received a referral to a psychologist or psychiatrist but his office was located too far from her home, and she does not have transportation.  (Id.).  Plaintiff stated that she saw a counselor at her school, who tried to refer her to a doctor, but they were unable to locate a doctor in her area.  (Id.).  Plaintiff testified that she has only seen the therapist at her school and has not seen a psychiatrist.  (Id.).  Plaintiff stated that her doctor's office told her that they were unable to find a doctor in her area that accepted her insurance for a psychiatric exam.  (Tr. 28).

Plaintiff testified that she takes medications for anxiety, depression, and concentration difficulties.  (Id.).  Plaintiff stated that her primary care doctor, Dr. Hossfeld, prescribes these medications.  (Id.).  Plaintiff testified that she has not received any counseling or therapy, other than from her school counselor.  (Id.).  Plaintiff stated that Dr. Hossfeld practices at People's Care Center.  (Id.).

Plaintiff testified that she has difficulty grasping many things, such as hair brushes or dishes.  (Tr. 29).  Plaintiff stated that she frequently drops dishes when she washes dishes.  (Id.).  Plaintiff testified that she is able to pick up small change.  (Id.).  Plaintiff stated that she occasionally has difficulty fastening buttons.  (Id.).

Plaintiff testified that she is able to comfortably lift about fifteen pounds and that she can

hold this amount of weight for up to five minutes. (<u>Id.</u>). Plaintiff stated that the largest amount of weight she is able to lift is twenty to twenty-five pounds. (Tr. 30). Plaintiff testified that she is able to walk about one block comfortably. (<u>Id.</u>). Plaintiff stated that after walking one block, her legs and feet start to burn and she feels a pulling sensation in her shoulder. (<u>Id.</u>). Plaintiff testified that she is able to sit for about thirty minutes before she has to get up and stretch her legs. (<u>Id.</u>).

The ALJ noted that plaintiff's classes last longer than thirty minutes. (<u>Id.</u>). Plaintiff stated that her classes last an hour to an hour-and-fifteen-minutes, and that she takes bathroom breaks during class to stretch her legs. (<u>Id.</u>).

Plaintiff testified that she has a computer at home, which her children use. (<u>Id.</u>). Plaintiff stated that she has four children, who are aged twenty-two, eighteen, nine, and eight. (<u>Id.</u>). Plaintiff testified that her twenty-two-year-old son receives Social Security disability benefits. (Tr. 31). Plaintiff stated that she stopped being the representative payee for her son's benefits when her son turned eighteen. (<u>Id.</u>). Plaintiff testified that she regained custody of this son a few months prior to his eighteenth birthday. (<u>Id.</u>). Plaintiff stated that she has never had custody of her son who is currently eighteen. (<u>Id.</u>). Plaintiff testified that she has always had custody of her two younger children. (<u>Id.</u>). Plaintiff stated that her twenty-two-year-old son no longer lives with her. (<u>Id.</u>).

Plaintiff testified that she experienced difficulty reaching when she was doing filing at her last position. (<u>Id.</u>). Plaintiff stated that when she reaches over her head, she feels a burning and pulling sensation all down her arms. (Tr. 32). Plaintiff testified that when she reaches up, her arm starts to tremble uncontrollably. (<u>Id.</u>). Plaintiff stated that she experiences difficulty combing her

hair.  (Id.).  Plaintiff testified that she is right-handed and that she experiences difficulty reaching with her right hand.  (Id.).  Plaintiff stated that her doctor told her that she has arthritis in her neck and back, and torn muscle tissue in her upper right shoulder.  (Id.).

Plaintiff testified that she also has problems with her left arm and hand, but not as severe as her right hand.  (Id.).  Plaintiff stated that she experiences tingling in her left hand but she does not get the tissue lump in her left shoulder like she does on the right side.  (Id.).

Plaintiff testified that she has undergone injections in her upper right shoulder every three months.  (Tr. 33).  Plaintiff stated that the injections help decrease the burning sensation in her arm.  (Id.).  Plaintiff testified that she also takes a lot of pain medication, which helps decrease the pain.  (Id.).

Plaintiff stated that her doctors have not recommended surgery.  (Id.).  Plaintiff testified that her doctors have decided to wait to see if the tissue will heal rather than repair it surgically.  (Id.).  Plaintiff stated that she has had problems with her right shoulder and arm for over two years.  (Id.).

Plaintiff testified that, on a typical day, she wakes up and helps her children get ready for school.  (Id.).  Plaintiff stated that she makes sure her children have clothes to wear.  (Id.).  Plaintiff testified that, after she gets her children prepared for school, she has about an hour to get ready for her classes to start.  (Tr. 34).  Plaintiff stated that she is unable to get everything done in an hour and is always running late.  (Id.).  Plaintiff testified that she loses concentration and forgets where she puts things.  (Id.).  Plaintiff stated that she prepares most meals using the microwave.  (Id.).  Plaintiff testified that her daughters try to help her with meals.  (Id.).  Plaintiff stated that she frequently drops dishes when she cooks.  (Id.).

Plaintiff testified that she has told her teachers that she suffers from depression and has some physical limitations. (Tr. 35). Plaintiff stated that she has not utilized the disability services that the school provides. (Id.). Plaintiff testified that she has received information about the disability services and is considering using them. (Id.). Plaintiff stated that she uses a mini recorder to take notes, or she copies a friend's notes. (Id.).

Plaintiff testified that she experiences side effects from her medications. (Id.). Plaintiff stated that she has a lot of diarrhea, sleepiness, and crying spells. (Id.). Plaintiff testified that she occasionally sleeps half the day due to her medication. (Id.). Plaintiff stated that she sleeps a lot when her pain is extensive, because she takes a double dosage of her medication. (Tr. 36). Plaintiff testified that this occurs about six days out of a month. (Id.). Plaintiff stated that she has diarrhea seven to eight times a month. (Id.). Plaintiff testified that her crying spells vary. (Id.). Plaintiff stated that she sometimes experiences crying spells every other day, but occasionally can go for about two weeks without a crying spell. (Id.).

Plaintiff testified that she smokes about ten cigarettes a day. (Id.).

The ALJ indicated that he would leave the record open for a month so plaintiff could submit additional medical records. (Tr. 37).

**B.    Relevant Medical Records**

The record reveals that plaintiff presented to the People's Health Centers on November 17, 2006, for a full physical exam. (Tr. 215-16). Plaintiff complained of neck pain radiating to her right upper arm along with numbness. (Tr. 215). The examining physician's assessment was neck pain and right upper limb pain. (Tr. 216).

Plaintiff saw Mollie Hossfeld, D.O. at People's Health Centers on December 2, 2006, with

complaints of right arm heaviness and pressure, which moved up to her neck; a burning sensation in her forearm; feet numbness; and shoulder and neck muscle tightness. (Tr. 218). Dr. Hossfeld noted that plaintiff had full range of motion of her right shoulder and that she was neurovascularly intact. (Tr. 219). Plaintiff exhibited positive signs of supraspinatus[1] impingement. (Id.). Dr. Hossfeld diagnosed plaintiff with depression and anxiety, which likely contributes to a majority of her symptoms; and right shoulder pain/supraspinatus impingement. (Id.). Dr. Hossfeld prescribed Paxil[2] and Xanax[3] for plaintiff's depression and anxiety and referred her for psychiatric testing. (Id.).

Plaintiff underwent an MRI of the cervical spine on February 9, 2007, which revealed early diffuse spondylosis[4] on the anterior aspect of the thecal sac[5] at C3-C4,[6] C6-C7 and with indentation on the thecal sac and anterior aspect of the spinal cord at C4-C5 and C5-C6; narrowing sagittal measurement bony neural canal to 0.7 cm at the C4-C6 level; and right neural foraminal impingement

---

[1]The supraspinatus muscle is the intrinsic muscle of the shoulder joint, the tendon of which contributes to the rotator cuff. Stedman's Medical Dictionary, 1255 (28th Ed. 2006).

[2]Paxil is an antidepressant indicated for the treatment of major depressive disorder, obsessive compulsive disorder, and panic disorder. See Physician's Desk Reference (PDR), 1535-36 (63rd Ed. 2009).

[3]Xanax is indicated for the treatment of anxiety and panic disorders. See WebMD, http://www.webmd.com/drugs (last visited August 26, 2011).

[4]Ankylosis (stiffening or fixation of a joint as the result of a disease process) of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature. See Stedman's at 1813, 95.

[5]A sheath that surrounds the spinal cord. See Stedman's at 1970.

[6]The back is comprised of the cervical, thoracic and lumbar regions. In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back. There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae. The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum. See J. Stanley McQuade, Medical Information Systems for Lawyers, § 6:27 (1993).

at C3-C4 and C4-C5. (Tr. 249-50).

Plaintiff saw Dr. Hossfeld on March 6, 2007, at which time she complained of continued neck and right arm pain, with numbness and tingling; left hand blisters; continued depression; and sore throat. (Tr. 222). Plaintiff indicated that she did not want to take medication for her depression and that she had not started the Paxil or Xanax. (Id.). Upon examination, plaintiff had decreased right shoulder range of motion due to pain. (Id.). Dr. Hossfeld diagnosed plaintiff with cervical spine spondylosis with right-sided foraminal narrowing; likely herpes zoster[7] of left C6 dermatome;[8] and depression/anxiety. (Id.). Dr. Hossfeld referred plaintiff to pain management and indicated that she would consider a referral to a neurosurgeon in the future if plaintiff's condition did not improve with conservative measures. (Id.). Dr. Hossfeld indicated that she recommended medication therapy for plaintiff's depression/anxiety, but plaintiff declined. (Id.).

Plaintiff presented to the emergency room at St. Mary's Health Center on March 27, 2007, with complaints of back, head, neck and shoulder pain. (Tr. 228). The examining physician's impression was neck pain. (Id.). Plaintiff was prescribed Vicodin.[9] (Id.).

Plaintiff underwent an MRI of the right shoulder on May 18, 2007, which revealed an undersurface tear of the anterior and central fibers of the supraspinatus; focal full thickness tear of

---

[7]An infection caused by a herpes virus, characterized by an eruption of groups of vesicles on one side of the body following the course of a nerve due to inflammation of ganglia and dorsal nerve roots resulting from activation of the virus, which in many instances has remained latent for years following a primary chickenpox infection; the condition is self-limited but may be accompanied by or followed by severe postherpetic pain. Stedman's at 882.

[8]An area of skin that is mainly supplied by a single spinal nerve. See Stedman's at 519.

[9]Vicodin is a narcotic analgesic and antitussive indicated for the relief of moderate to moderately severe pain. See PDR at 529.

the posterior fibers of the supraspinatus; and tendinopathy[10] of the supraspinatus and infraspinatus.[11] (Tr. 248).

Plaintiff saw Dr. Hossfeld on June 4, 2007, at which time she complained of continued neck and right arm pain, with numbness and tingling; left hand blisters; continued depression; and pain with urination. (Tr. 252). Upon examination, Dr. Hossfeld noted decreased right shoulder range of motion due to pain and evidence of supraspinatus injury. (Id.). Dr. Hossfeld's assessment was cervical spine spondylosis with right-sided foraminal narrowing, herpes zoster of left C6 dermatome, depression/anxiety, right-sided supraspinatus tear, and urinary tract infection. (Tr. 252-53). Dr. Hossfeld prescribed Ultram[12] and Amitriptyline[13] for plaintiff's cervical spine spondylosis, and noted that plaintiff would be referred to pain management. (Id.). Dr. Hossfeld recommended medication therapy for plaintiff's depression and anxiety but plaintiff declined. (Id.).

Plaintiff presented to the emergency room at St. Mary's Health Center on July 23, 2007, with complaints of neck pain. (Tr. 279). Plaintiff was diagnosed with depression and anxiety. (Id.).

Plaintiff saw Jacques S. VanRyn, M.D. on July 25, 2007, with complaints of right shoulder and neck pain. (Tr. 291). Upon examination, plaintiff had full cervical range of motion; neck and upper scapular pain with rotation to the right; flexion and extension to 70 degrees; bilateral rotation

---

[10]A disease of the tendon. See Stedman's at 1944.

[11]The infraspinatus muscle is the intrinsic muscle of the shoulder joint, the tendon of which contributes to the formation of the rotator cuff. Stedman's at 1245.

[12]Ultram is a centrally acting synthetic opioid analgesic indicated for the treatment of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See PDR at 2429.

[13]Amitriptyline is an antidepressant medication indicated for the treatment of depression and other mood disorders. See WebMD, http://www.webmd.com/drugs (last visited August 26, 2011).

about 90 degrees; and full motor strength of the bilateral upper extremities. (Id.). Dr. VanRyn diagnosed plaintiff with cervical radiculopathy[14] and right shoulder impingement syndrome. (Tr. 292). He administered a cortisone injection to plaintiff's shoulder. (Id.).

Judith McGee, Ph.D. completed a Psychiatric Review Technique on August 3, 2007. (Tr. 257-68). Dr. McGee expressed the opinion that plaintiff's depression and anxiety were non-severe and caused mild limitations in plaintiff's activities of daily living; ability to maintain social functioning; and ability to maintain concentration, persistence, or pace. (Tr. 265).

Plaintiff presented to Robert A. Swarm, M.D., Chief, Clinical Pain Management at Washington University Pain Management Center, on August 8, 2007, upon the referral of Dr. Hossfeld for a consultation regarding her persistent neck, right shoulder, and right upper extremity pain. (Tr. 332-333). Plaintiff indicated that she was involved in a motor vehicle accident in June of 2006, and began having more difficulty with persistent neck and right upper extremity pain after this time. (Id.). Plaintiff reported that her pain ranges from a two to an eight on a scale of one to ten. (Id.). Upon examination, plaintiff had significant tenderness to palpation in the right posterior shoulder musculature. (Id.). Dr. Swarm's impression was other chronic pain, cervical spinal canal stenosis, and medical problems including: occasional lower extremity edema, headache, depression/anxiety, and productive cough. (Tr. 333). Dr. Swarm recommended physical therapy, spinal steroid injections, and discontinuation of tobacco abuse. (Id.). Dr. Swarm administered a cervical epidural steroid injection. (Tr. 351).

Plaintiff saw Dr. Hossfeld on September 7, 2007, at which time she reported that the pain in her right arm, neck and shoulder significantly improved post injection to the right shoulder. (Tr.

---

[14]Disorder of the spinal nerve roots. Stedman's at 1622.

283). Dr. Hossfeld's assessment was cervical spine spondylosis with right-sided foraminal narrowing; herpes zoster of left C6 dermatome; depression/anxiety; right-sided supraspinatus tear; hematoma;[15] and chest pain. (Tr. 283-84). Dr. Hossfeld prescribed Tylenol 3[16] and Amitriptyline for plaintiff's cervical spine spondylosis. (Id.). Plaintiff again declined medication for her depression/anxiety. (Id.).

Plaintiff saw Dr. VanRyn on October 5, 2007, at which time Dr. VanRyn noted that plaintiff was doing fair. (Tr. 289). Upon examination, plaintiff had full cervical range of motion, some pain in her first rib point area, exquisite trigger point[17] in the right first rib, moderate tenderness over the costovertebral[18] area, full motor strength, and some tenderness over her greater tuberosity[19] on the right side. (Id.). Dr. VanRyn diagnosed plaintiff with cervical strain with flare up of the first rib point on the right side, and administered a cortisone injection to this area. (Id.). He also recommended a strengthening program. (Id.).

Plaintiff saw Dr. VanRyn on November 2, 2007, at which time Dr. VanRyn noted that plaintiff was doing significantly better. (Tr. 288). Upon examination, plaintiff had full cervical range of motion, mild pain over the first rib point but much better, and full motor strength of the upper

---

[15]A localized mass of blood that is relatively or completely confined within an organ or tissue. Stedman's at 863.

[16]Tylenol with Codeine, or Tylenol 3, is indicated for the relief of mild to moderately severe pain. See PDR at 2427.

[17]A trigger point is a specific point or area where stimulation by touch, pain, or pressure induces a painful response. Stedman's at 1529.

[18]Relating to the ribs and the bodies of the thoracic vertebrae with which they articulate. Stedman's at 451.

[19]A large tubercle or rounded elevation, especially from the surface of a bone. Stedman's at 2048.

extremities.  (Id.).  Dr. VanRyn's assessment was periscapular strain plus shoulder contusion under good control on current program.  (Id.).  He advised plaintiff to maintain a good home program. (Id.).

Plaintiff saw Dr. Hossfeld on November 9, 2007, for a follow-up regarding her arthritis and depression.  (Tr. 281).  Plaintiff reported that her right arm, neck and shoulder pain significantly improved post injection to the right shoulder.  (Id.).  Plaintiff declined epidural injections due to such "dramatic improvement" of pain post shoulder injection.  (Id.).  Plaintiff complained of continued depression, with multiple pains, mood swings, and difficulty concentrating.  (Id.).  Plaintiff requested a psychiatry referral and medication.  (Id.).  Dr. Hossfeld's diagnoses did not change.  (Id.).  She prescribed Tylenol 3, Fluoxetine, and Xanax, and referred plaintiff to a psychiatrist.  (Id.).

Plaintiff saw Dr. VanRyn on November 28, 2007, at which time she complained of neck pain. (Tr. 287).  Plaintiff complained of increased left shoulder and neck pain with radicular symptoms down her left arm, difficulty lying on her left side, and pain in her left periscapular region.  (Id.). Upon examination, plaintiff had a positive Spurling's maneuver[20] to the left, and marked tenderness to palpation in her periscapular region and first rib point.  (Id.).  Plaintiff underwent x-rays of her cervical spine, which revealed loss of her lordotic curve[21] on the lateral view as well as some spurring

---

[20]In a patient with neck pain or pain that radiates below the elbow, a useful maneuver to further evaluate the cervical spine is Spurling's test.  The patient's cervical spine is placed in extension and the head rotated toward the affected shoulder.  An axial load is then placed on the spine.  Reproduction of the patient's shoulder or arm pain indicates possible cervical nerve root compression and warrants further evaluation of the bony and soft tissue structures of the cervical spine.  See American Family Physician, The Painful Shoulder: Part I.  Clinical Evaluation (May 15, 2000), available at:  http://www.aafp.org/afp/20000515/3079.html (last visited August 26, 2011).

[21]The normal, anteriorly convex curvature of the cervical segment of the vertebral column. Stedman's at 1119.

at C3-4, mild posterior spurring at 4-5, 5-6, and 6-7, and foraminal narrowing on the right and left at C3-4. (Id.). Dr. VanRyn's impression was cervical radiculitis.[22] (Id.). He prescribed Skelaxin,[23] advised plaintiff to avoid lifting anything heavy, and recommended physical therapy. (Id.).

Plaintiff saw Dr. Hossfeld on January 11, 2008, at which time she complained of increased left shoulder pain and cervical radiculopathy. (Tr. 302). Dr. Hossfeld indicated that plaintiff had symptoms of hopelessness, depression, anxiousness, and crying spells. (Id.). Dr. Hossfeld continued plaintiff on Fluoxetine and Xanax, and referred her to a psychiatrist. (Tr. 303).

Plaintiff saw Dr. VanRyn on January 25, 2008, at which time she complained of "considerable problems," including neck numbness and paresthesias[24] going down to her hand. (Tr. 286). Upon examination, plaintiff was moderately tender in the first rib point, moderately tender in the left lateral cervical area, flexion/extension of 60 degrees, 80 degrees of right rotation, and 70 degrees of left rotation, "very positive" Spurling's maneuver on the left side, and radiculopathy with pain down into the arm. (Id.). Dr. VanRyn diagnosed plaintiff with "cervical radiculopathy not making progress." (Id.).

Plaintiff saw Dr. Hossfeld on April 1, 2008, at which time she complained of continued severe left shoulder pain. (Tr. 297). Dr. Hossfeld noted psychiatric symptoms of hopelessness, depression, anxiety, and crying spells. (Id.). Dr. Hossfeld indicated that plaintiff had decreased extension and

---

[22]Disorder of the spinal nerve roots. Stedman's at 1622.

[23]Skelaxin is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions. See PDR at 1784.

[24]A spontaneous abnormal usually nonpainful sensation (e.g., burning, pricking); may be due to lesions of both the central and peripheral nervous systems. Stedman's at 1425.

internal rotation of the left shoulder. (Tr. 298). Dr. Hossfeld diagnosed plaintiff with osteoarthritis[25] and cervical radiculopathy. (Id.). She continued plaintiff on her medications. (Id.).

On July 1, 2008, Dr. Hossfeld diagnosed plaintiff with left shoulder pain, cervical osteoarthritis with radiculopathy, herpes zoster, and depression/anxiety. (Tr. 294). She referred plaintiff to a psychiatrist and scheduled an MRI of the left shoulder. (Id.).

Plaintiff presented to University Health Services at the University of Missouri on October 1, 2008, with complaints of depression and anxiety. (Tr. 352). A nurse practitioner diagnosed plaintiff with post-traumatic stress disorder (PTSD).[26] (Tr. 353).

Plaintiff saw Dr. VanRyn on March 23, 2009, at which time Dr. VanRyn stated that plaintiff was doing "fairly well," with her left shoulder. (Tr. 307). Dr. VanRyn noted that plaintiff had made some progress but was starting to get pain again. (Id.). Upon examination, plaintiff had full range of motion of the shoulder, flexion/extension of the neck was 60 degrees, 65 degrees right, 70 degrees left; and she had a markedly positive trigger point on the right side about the first rib area. (Id.). Dr. VanRyn's assessment was cervical radiculopathy and some mild shoulder ache. (Id.). He administered a trigger point injection. (Id.).

---

[25]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

[26]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently reexperiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and dysphoria. Stedman's at 570.

On April 21, 2009, Dr. Hossfeld diagnosed plaintiff with major depressive disorder[27] and anxiety; and osteoarthritis causing shoulder pain. (Tr. 318). Dr. Hossfeld prescribed Lexapro.[28] (Id.). She indicated that plaintiff declined a psychiatric consultation. (Id.).

On June 17, 2009, Dr. Hossfeld completed a Physical Residual Functional Capacity Questionnaire. (Tr. 354-59). Dr. Hossfeld indicated that plaintiff had diagnoses of cervical spinal stenosis, shoulder osteoarthritis, major depressive disorder, and anxiety. (Tr. 354). Dr. Hossfeld listed plaintiff's symptoms as neck, shoulder, and arm pain; myalgia; insomnia; anxiety attacks; and chest pain. (Id.). Dr. Hossfeld stated that plaintiff has daily pain, worsened with lifting, reaching, pushing, and pulling. (Id.). She listed the clinical findings supporting her opinion as x-rays and an MRI. (Tr. 355). Dr. Hossfeld indicated that plaintiff's pain medication caused drowsiness. (Id.). Dr. Hossfeld found that plaintiff was not a malingerer. (Id.). Dr. Hossfeld indicated that plaintiff suffered from depression and anxiety, and that emotional factors contribute to the severity of her symptoms. (Id.). Dr. Hossfeld found that plaintiff's experience of pain or other symptoms was severe enough to interfere with attention and concentration constantly. (Tr. 356). Dr. Hossfeld indicated that plaintiff could tolerate moderate work stress, noting that her pain, depression, and anxiety worsened with stress. (Id.). Dr. Hossfeld expressed the opinion that plaintiff could walk four to six city blocks, sit more than two hours, stand two hours, sit for a total of four hours in an eight-hour workday, stand two hours in an eight-hour workday, frequently lift less than ten pounds, occasionally lift ten to twenty pounds, and never lift fifty pounds. (Tr. 356-58). Dr. Hossfeld

_____

[27]A mental disorder characterized by sustained depression of mood, anhedonia, sleep and appetite disturbances, and feelings of worthlessness, guilt, and hopelessness. Stedman's at 515.

[28]Lexapro is indicated for the treatment of major depressive disorder. See PDR at 1175.

indicated that plaintiff had significant limitations in doing repetitive reaching, handling, or fingering; and stooping and crouching.  (Id.).  Dr. Hossfeld also found that plaintiff must walk every sixty minutes for about two minutes each time; requires a job that permits shifting positions at will from sitting, standing, or walking; and will sometimes need to take ten-minute-long unscheduled breaks during an eight-hour work day.  (Id.).  Finally, Dr. Hossfeld indicated that plaintiff would likely be absent from work as a result of her impairments about once a month.  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2.  The claimant has not engaged in substantial gainful activity since December 1, 2004, the alleged onset date (20 CFR 404.1571 *et. seq.*, and 416.971 *et seq.*).

3.  The claimant has the following severe impairment: Chronic neck and shoulder pain (20 CFR 404.1520(c) and 416.920(c).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

6.  The claimant is capable of performing past relevant work as a telemarketer.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant has not been under a disability, as defined in the Social Security Act, from December 1, 2004 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 10-14).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on May 18, 2007, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

> Based on the application for supplemental security income protectively filed on May 18, 2007, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 14).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).   The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.      The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See

20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c).

If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in failing to properly consider medical opinion

evidence. Plaintiff also argues that the ALJ inadvertently weighed the opinion of a state agency

lay person under the rules appropriate for weighing the opinion of a medical consultant. Plaintiff

next contends that, in determining plaintiff's residual functional capacity, the ALJ failed to

properly consider plaintiff's depression. Plaintiff finally argues that the ALJ failed to properly

consider plaintiff's ability to perform past relevant work pursuant to the Commissioner's

regulations. The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's

evaluation of the medical opinion evidence.

Plaintiff argues that the ALJ failed to properly consider the opinion of treating physician

Dr. Hossfeld. In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts

among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148

(8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a

treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d

1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)).

Further, a treating physician's opinion will typically be given controlling weight when the opinion

is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010,

1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original).

Such opinions, however, do "not automatically control, since the record must be evaluated as a

whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may

be discounted or disregarded where other "medical assessments 'are supported by better or more

thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

Whatever weight the ALJ accords the treating physician's report, be it substantial or little,

the ALJ is required to give good reasons for the particular weight given the report. See Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001). The ALJ, however, is not required to discuss every piece of evidence submitted. See Morrison v. Apfel, 146 F.3d 625, 628 (8th Cir. 1998). If the opinion of a treating physician is not well supported or is inconsistent with other evidence, the ALJ must consider: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by the relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered, and (6) other factors which may contradict or support the opinion. See Rhodes, 40 F. Supp.2d at 1119; 20 C.F.R. § 404.1527 (d)(2)-(6).

Dr. Hossfeld completed a Physical Residual Functional Capacity Questionnaire on June 17, 2009, in which she expressed the opinion that plaintiff could walk four to six city blocks, sit more than two hours, stand two hours, sit for a total of four hours in an eight-hour workday, stand two hours in an eight-hour workday, frequently lift less than ten pounds, occasionally lift ten to twenty pounds, and never lift fifty pounds. (Tr. 356-58). Dr. Hossfeld indicated that plaintiff had significant limitations in doing repetitive reaching, handling, or fingering; and stooping and crouching. (Id.). Dr. Hossfeld also found that plaintiff must walk every sixty minutes for about two minutes each time; requires a job that permits shifting positions at will from sitting, standing, or walking; and will sometimes need to take ten-minute-long unscheduled breaks during an eight-hour work day. (Id.).

The ALJ indicated that she was assigning "nominal weight" to Dr. Hossfeld's opinion.

(Tr. 13). The ALJ found that the record was non-supportive of the extreme limitations found by Dr. Hossfeld. (Tr. 14). The ALJ noted that the record routinely evidences plaintiff to possess a full range of her cervical spine and full motor strength of her upper extremities. (Id.).

The undersigned finds that the ALJ's decision to assign "nominal weight" to Dr. Hossfeld's opinion is not supported by substantial evidence. Dr. Hossfeld had been plaintiff's treating physician since 2006 and regularly treated plaintiff for her various impairments. Dr. Hossfeld indicated that her opinion was based on plaintiff's diagnoses of cervical spinal stenosis, shoulder osteoarthritis, major depressive disorder, and anxiety. (Tr. 354). Dr. Hossfeld listed plaintiff's symptoms as neck, shoulder, and arm pain; myalgia; insomnia; anxiety attacks; and chest pain. (Id.). Dr. Hossfeld stated that plaintiff has daily pain, worsened with lifting, reaching, pushing, and pulling. (Id.). She listed the clinical findings supporting her opinion as x-rays and MRI. (Tr. 355). Dr. Hossfeld indicated that plaintiff suffered from depression and anxiety, and that emotional factors contribute to the severity of her symptoms. (Id.). Dr. Hossfeld found that plaintiff's experience of pain or other symptoms was severe enough to interfere with attention and concentration constantly. (Tr. 356).

Dr. Hossfeld provided sufficient explanations for her opinion, and her opinion is supported by the objective medical record. First, Dr. Hossfeld's opinion is supported by her own treatment notes. Dr. Hossfeld consistently diagnosed plaintiff with cervical spinal stenosis, shoulder osteoarthritis, depression, and anxiety. (Tr. 219, 222, 252-53, 283-84, 281, 303, 297, 294, 318). Plaintiff regularly complained of neck and right arm pain and numbness, and shoulder pain. (Id.). The ALJ found that the medical record was non-supportive of Dr. Hossfeld's opinion, noting only that plaintiff routinely had full range of motion of her cervical spine and full motor strength of her

upper extremities. (Tr. 14). Dr. Hossfeld's diagnoses of cervical spinal stenosis and shoulder osteoarthritis, however, were supported by Dr. Hossfeld's other findings upon examination. On December 2, 2006, plaintiff exhibited positive signs of supraspinatus impingement. (Tr. 219). On March 6, 2007, plaintiff had decreased right shoulder range of motion due to pain. (Tr. 222). On June 4, 2007, plaintiff had decreased right shoulder range of motion due to pain and evidence of supraspinatus injury. (Tr. 252). On April 1, 2008, plaintiff had decreased extension and internal rotation of the left shoulder. (Tr. 298). The ALJ did not discuss any of these findings, which support Dr. Hossfeld's opinion.

Dr. Hossfeld indicated that her opinion was supported by MRIs and x-rays. (Tr. 355). The record is consistent with this finding. An MRI of the cervical spine plaintiff underwent on February 9, 2007 revealed cervical spine spondylosis and right neural foraminal impingement at C3-4 and C4-5. (Tr. 249-50). Plaintiff underwent an MRI of the right shoulder on May 18, 2007, which revealed a supraspinatus tear. (Tr. 248). Plaintiff underwent x-rays of her cervical spine on November 28, 2007, which revealed spurring at several levels and foraminal narrowing on the right and left at C3-4. (Tr. 287). .

Dr. Hossfeld's opinion is also supported by the remainder of the objective medical evidence. On July 25, 2007, Dr. VanRyn diagnosed plaintiff with cervical radiculopathy and right shoulder impingement syndrome. (Tr. 292). On August 8, 2007, Dr. Swarm noted significant tenderness to palpation in the right posterior shoulder musculature and diagnosed plaintiff with chronic pain and cervical spinal canal stenosis. (Tr. 333). Dr. Swarm administered a cervical epidural steroid injection. (Tr. 351). On October 5, 2007, Dr. VanRyn noted exquisite trigger point in the right first rib and tenderness upon examination. (Tr. 289). He diagnosed plaintiff

with cervical strain with flare up of the first rib point on the right side, and administered a cortisone injection to this area. (Id.). On November 28, 2007, Dr. VanRyn noted a positive Spurling's maneuver to the left, and marked tenderness to palpation in her periscapular region and first rib point. (Tr. 287). Dr. VanRyn diagnosed plaintiff with cervical radiculitis. (Id.). On January 25, 2008, Dr. VanRyn noted tenderness in the first rib point and left lateral cervical area, "very positive" Spurling's maneuver on the left side, and radiculopathy with pain down into the arm. (Tr. 286). He diagnosed plaintiff with "cervical radiculopathy not making progress." (Id.). On March 23, 2009, Dr. VanRyn noted markedly positive trigger point on the right side about the rib area and assessed plaintiff with cervical radiculopathy. (Tr. 307). He administered a trigger point injection. (Id.).

In sum, the ALJ did not provide sufficient reasons for rejecting the opinion of treating physician Dr. Hossfeld. Dr. Hossfeld cited evidence in support of her opinion and her opinion is consistent with her own treatment notes. Dr. Hossfeld's opinion is also supported by the remainder of the medical record, including objective testing and the treatment notes of Drs. VanRyn and Swarm.

Plaintiff also argues that the ALJ erred in inadvertently weighing the opinion of a state agency lay person under the rules appropriate for weighing the opinion of a medical consultant.

The ALJ stated as follows:

> In accordance with Social Security Ruling 96-6p, the Administrative Law Judge has considered the administrative findings of fact made by the State agency medical physicians and other consultants. These opinions are weighed as non-examining expert sources.

(Tr. 14).

As plaintiff points out, the only state agency opinion contained in the record is a Physical

- 27 -

Residual Functional Capacity Assessment dated August 3, 2007, completed by "W. Hughes." (Tr. 274). The credentials of W. Hughes are not listed and the box titled "Medical Consultant's Code" is empty. (Id.). As such, it appears that W. Hughes is not a physician or medical consultant.

Plaintiff cites Dewey v. Astrue, 509 F.3d 447 (8th Cir. 2007) in support of her argument that the ALJ erroneously weighed the assessment of a non-medical state agency consultant in determining plaintiff's residual functional capacity. In that case, the ALJ explicitly credited the physical residual functional capacity assessment on the mistaken belief that it had been authored by a physician. Id. at 448-49. Noting that this assessment was less restrictive than that of the claimant's treating physician, the Eighth Circuit held that it was not harmless error because it could not be said that the ALJ would inevitably have reached the same conclusion had he understood that the assessment had not been completed by an acceptable medical source. Id. at 449-50.

In this case, as in Dewey, the ALJ appeared to believe that the physical residual functional capacity assessment dated August 3, 2007 was completed by an acceptable medical source. The ALJ did not indicate the weight he was assigning to this opinion. It is significant that, as in Dewey, the opinion of the layperson state agency consultant was much less restrictive than the opinion of plaintiff's treating physician, which the ALJ rejected. As such, the ALJ erred in inadvertently weighing the opinion of a lay person under the rules appropriate for weighing the opinion of a medical consultant in reaching the conclusion that plaintiff was not disabled.

The ALJ then made the following determination regarding plaintiff's residual functional capacity:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b).

(Tr. 12).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

The undersigned finds that the ALJ's residual functional capacity determination is not supported by substantial evidence. The ALJ did not provide a rationale for his residual functional capacity nor did he cite any medical opinions supporting his determination. As previously discussed, the ALJ improperly assigned nominal weight to the opinion of plaintiff's treating physician, Dr. Hossfeld. There is no opinion from any other examining physician, treating or consulting, regarding plaintiff's ability to function in the workplace with her impairments. The ALJ also inadvertently weighed the opinion of a lay person in determining plaintiff's residual functional capacity.

Further, in determining plaintiff's residual functional capacity, the ALJ failed to consider plaintiff's mental impairments. Plaintiff has consistently been diagnosed with depression and anxiety. With respect to plaintiff's mental impairments, the ALJ noted that plaintiff was alleging disability due to "emotional/mental impairment," and stated "the record at present does not, however, evidence any ongoing pursuit of treatment related to such or any emotional/mental disorders." (Tr. 10).

The ALJ erred in failing to properly consider plaintiff's mental impairments. The ALJ did not acknowledge plaintiff's consistent diagnoses of depression and anxiety. Even if the ALJ concluded that plaintiff's mental impairments were not severe, she was still required to determine how they affected plaintiff's ability function in the workplace. Plaintiff's treating physician, Dr. Hossfeld, consistently diagnosed plaintiff with depression and anxiety and indicated that these impairments contributed to the severity of her symptoms. (Tr. 355). Plaintiff was also diagnosed with anxiety and depression by emergency room physicians at St. Mary's Health Center on July 23, 2007, and by Dr. Swarm on August 8, 2007. (Tr. 279, 333).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland , 204 F.3d at 858. Here, the ALJ's residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

After determining plaintiff's residual functional capacity, the ALJ then found that plaintiff retained the ability to perform her past relevant work as a telemarketer. (Tr. 14). The undersigned has found that the residual functional capacity formulated by the ALJ was not supported by substantial evidence. As such, the ALJ's step four determination was similarly not

supported by substantial evidence.

## Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence. The ALJ failed to properly weigh the medical opinions and failed to develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace. The ALJ's assessment of plaintiff's residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity. For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this   20th   day of September, 2011.

*Lewis M. Blanton*
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE